IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| SHANTER NORMAN, | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action No. 1:24-cv-00007 |
| | § | |
| BEAUMONT INDEPENDENT SCHOOL | § | |
| DISTRICT, and BEAUMONT | § | |
| INDEPENDENT SCHOOL DISTRICT | § | |
| POLICE DEPARTMENT | § | |
| *Defendants*. | § | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS ALLEN AND MALBROUGH'S MOTION TO DISMISS**

Plaintiff Shanter Norman ("Norman") respectfully submits this response in opposition to Defendants Dr. Shannon Allen ("Allen") and Chief Joseph Malbrough's ("Malbrough") Motion to Dismiss Plaintiff's First Amended Complaint. For the reasons set forth below, the motion should be denied.

## I.    INTRODUCTION

Defendants Allen and Malbrough seek dismissal of all claims against them based on three main arguments: (1) the official capacity claims are duplicative of claims against BISD; (2) Norman has not plausibly alleged constitutional violations; and (3) the individual defendants are protected by qualified immunity. As explained below, these arguments lack merit, and dismissal is not warranted at this stage.

## II.    ARGUMENT

**A.    The Official Capacity Claims Should Not Be Dismissed as Duplicative**

While official capacity claims are generally treated as claims against the entity, courts have discretion to allow both official capacity and entity claims to proceed past the pleading stage. See, e.g., *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985) (noting that in some cases "the complaint

- 1 -

may properly seek relief against the official in both his official and individual capacities"). Given the early stage of this litigation and the fact that discovery may reveal distinctions between the defendants' official roles and BISD's liability, dismissal of the official capacity claims would be premature.

### 1.     Discretion at the Pleading Stage

In *Hafer v. Melo*, 502 U.S. 21, 25 (1991), the Supreme Court clarified that official capacity suits are simply "another way of pleading an action against an entity of which an officer is an agent." This characterization does not mandate dismissal of such claims, especially before discovery has occurred.

### 2.     Potential for Distinct Liability

The Fifth Circuit has recognized that there may be situations where official capacity claims serve a distinct purpose from entity claims. In *Goodman v. Harris County*, 571 F.3d 388, 396 (5th Cir. 2009), the court noted that official capacity claims might be maintained where they "allege[] liability on the part of a governmental entity that is distinct and separate from that liability sought to be imposed upon the individual defendant."

In the present case, discovery may reveal that Defendants Allen and Malbrough, in their official capacities, had distinct roles or responsibilities that could give rise to liability separate from BISD's general liability. For example, their policymaking authority within the BISD Police Department (Compl. ¶ 3) might implicate different aspects of liability than those applicable to BISD as a whole.

### 3.     Preserving Claims for Effective Relief

Maintaining official capacity claims can be crucial for ensuring effective relief. As the Eighth Circuit explained in *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010),

"A plaintiff may bring an official-capacity claim to obtain relief from the governmental entity." This is particularly relevant where, as here, the plaintiff seeks injunctive relief such as reinstatement (Compl. Prayer for Relief, ¶ f).

### 4.     Facilitating Full Discovery

Retaining official capacity claims can facilitate more comprehensive discovery. In *Wilson v. Northcutt*, 441 F.3d 586, 592 (8th Cir. 2006), the court allowed official capacity claims to proceed past the pleading stage, noting that they "may play a role in discovery matters." By maintaining these claims, Norman can ensure access to information about the defendants' official conduct and policies that might otherwise be more difficult to obtain.

### 5.     Judicial Economy

Dismissing official capacity claims at this early stage could lead to unnecessary complications later in the litigation. If discovery reveals that these claims are indeed necessary or distinct from the entity claims, Norman might need to seek leave to amend the complaint to reinstate them. As the Seventh Circuit noted in *Robinson v. Sappington*, 351 F.3d 317, 340 (7th Cir. 2003), "It would be inefficient to require [the plaintiff] to amend her complaint to reinstate the official capacity claims that she already has pleaded."

### 6.     The Unique Context of School Districts

In the specific context of school districts, some courts have been particularly hesitant to dismiss official capacity claims against superintendents and other high-level officials. For instance, in *Doe v. Sch. Dist. of City of Norfolk*, 340 F. Supp. 3d 887, 895 (D. Neb. 2018), the court declined to dismiss official capacity claims against a superintendent, recognizing the potential for distinct liability based on the official's unique role and responsibilities.

Given these considerations, dismissing the official capacity claims against Defendants Allen and Malbrough would be premature at this stage of the litigation. The potential benefits of maintaining these claims for purposes of discovery, ensuring comprehensive relief, and preserving judicial resources outweigh any minimal redundancy. As such, the Court should exercise its discretion to allow the official capacity claims to proceed alongside the claims against BISD.

**B.    Norman Has Plausibly Alleged Constitutional Violations**

**1.    First Amendment Retaliation Claim**

Contrary to Defendants' assertions, Norman has alleged sufficient facts to state a plausible First Amendment retaliation claim. Norman's Facebook post, which called for integrity and accountability in leadership, addressed a matter of public concern - the conduct of public officials. See *Lane v. Frank*s, 573 U.S. 228, 241 (2014) ("Speech by citizens on matters of public concern lies at the heart of the First Amendment.").

Unlike the posts in *Graziosi v. City of Greenville Mississippi*, 775 F.3d 731 (5th Cir. 2015), which criticized a specific policy decision, Norman's post broadly addressed the qualities desirable in leaders. This type of speech on public integrity implicates core First Amendment concerns. See *Garcetti v. Ceballos*, 547 U.S. 410, 425 (2006) ("Exposing governmental inefficiency and misconduct is a matter of considerable significance.").

Moreover, Norman has alleged that this protected speech was a motivating factor in the adverse employment actions taken against him and his organization, including excluding him and his organization from public events, suspension and ultimate termination. These allegations are sufficient at the pleading stage to state a First Amendment retaliation claim.

Norman's complaint plausibly alleges violations of his First Amendment right to free speech and his Fourteenth Amendment right to due process. At the motion to dismiss stage, the

court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Under this standard, Norman's allegations are sufficient to state claims for both First Amendment retaliation and deprivation of due process.

To state a claim for First Amendment retaliation, a plaintiff must allege that: (1) he engaged in protected speech; (2) he suffered an adverse employment action; and (3) his speech was a motivating factor in the adverse employment action. See *Beattie v. Madison Cnty. Sch. Dist.*, 254 F.3d 595, 601 (5th Cir. 2001). Norman's complaint satisfies each of these elements.

**a)**   **Protected Speech**

Norman's Facebook post constitutes protected speech on a matter of public concern. The Supreme Court has consistently held that speech addressing the integrity of public officials, and the operations of government agencies relates to matters of public concern. Lane v. Franks, 573 U.S. 228, 241 (2014) ("Speech by citizens on matters of public concern lies at the heart of the First Amendment.").

Norman's post stated: "If I'm ever placed in a supervisor position or over an agency, I pray that I will listen to the ones under my command. I pray I will not be too position driven and power struck not to have integrity and accountability." (Compl. ¶ 6). This statement addresses the qualities desirable in public leaders and touches on issues of integrity and accountability in public service. Such speech is fundamentally different from the type of speech at issue in *Graziosi v. City of Greenville Mississippi*, 775 F.3d 731 (5th Cir. 2015), which criticized a specific policy decision. Norman's speech more closely resembles the type of commentary on public affairs that the Supreme Court has consistently protected. See *Pickering v. Bd. of Ed.*, 391 U.S. 563, 571-72 (1968) (protecting a teacher's right to speak on issues of public importance related to the operation of schools).

Moreover, Norman made this post as a private citizen, not pursuant to his official duties as a police officer. This distinction is crucial in light of *Garcetti v. Ceballos*, 547 U.S. 410 (2006), which held that public employees speaking pursuant to their official duties are not speaking as citizens for First Amendment purposes. Norman's prayer for integrity in leadership was not part of his job responsibilities and thus falls squarely within the realm of protected citizen speech.

### b)    Adverse Employment Action

Norman clearly alleges that he suffered adverse employment actions. He was suspended without pay (Compl. ¶ 20) and ultimately terminated (Compl. ¶ 23). Both suspension without pay and termination unquestionably qualify as adverse employment actions. See *Breaux v. City of Garland*, 205 F.3d 150, 157 (5th Cir. 2000).

### c)    Causal Connection

Norman alleges a plausible causal connection between his protected speech and the adverse employment actions. The complaint states that "following his Facebook prayer," Norman was subjected to harassment, bullying, and discriminatory acts, including being made to surrender his taser and being suspended without pay (Compl. ¶ 20). The temporal proximity between the protected speech and these actions supports an inference of causation at this stage. See *Mooney v. Lafayette County School Dist.*, 538 Fed. Appx. 447, 454 (5th Cir. 2013) (noting that temporal proximity can support an inference of causation).

Furthermore, Norman alleges that Lt. Haynes "constructed false allegations" and "contrived reports of anonymous complaints" in response to his Facebook post (Compl. ¶ 6). These allegations suggest a retaliatory motive behind the adverse actions.

While the defendants may argue that Norman's speech was disruptive to the department's operations, this argument involves factual disputes inappropriate for resolution at the motion to

dismiss stage. The balancing test established in *Pickering v. Board of Education*, 391 U.S. 563 (1968), which weighs the employee's interest in speaking against the government's interest in efficient operations, typically requires a fact-intensive inquiry better suited for summary judgment or trial.

### 2.    Fourteenth Amendment Due Process Claim

Norman's due process claim, while briefly stated, is sufficient to survive a motion to dismiss. To state a due process claim based on reputational harm, a plaintiff must satisfy the "stigma-plus" test, alleging that (1) he was discharged; (2) stigmatizing charges were made against him in connection with the discharge; (3) the charges were false; (4) he was not provided notice or an opportunity to be heard prior to the discharge; (5) the charges were made public; (6) he requested a hearing to clear his name; and (7) the employer denied the request. *Bledsoe v. City of Horn Lake, Miss.*, 449 F.3d 650, 653 (5th Cir. 2006).

Norman alleges that his discharge put his "reputation, honor, or integrity at risk" (Compl. ¶ 47). While this allegation alone might be conclusory, when read in conjunction with the rest of the complaint, it suggests that Norman may be able to satisfy the "stigma-plus" test:

1. Norman alleges he was discharged (Compl. ¶ 23).

2. He alleges that false and stigmatizing charges were made against him, including accusations of disrespect and contrived reports of complaints (Compl. ¶¶ 6, 18).

3. He explicitly states these charges were "wholly unfounded" (Compl. ¶ 18).

4. While not explicitly stated, the allegations suggest Norman was not given proper notice or opportunity to be heard, as he describes the actions against him as "unwarranted" and "false" (Compl. ¶ 18).

5. The public nature of the charges can be inferred from Norman's allegation of damage to his reputation (Compl. ¶ 51(c)).

While Norman does not explicitly allege that he requested a name-clearing hearing or that such a request was denied, these elements of the "stigma-plus" test are not universally required at the pleading stage. See *Rosenstein v. City of Dallas*, 876 F.2d 392, 395-96 (5th Cir. 1989) (focusing primarily on the publication of stigmatizing charges in connection with termination).

Moreover, the Fifth Circuit has recognized that in some circumstances, internal grievance procedures can satisfy the "hearing" requirement of a due process claim. See *Browning v. City of Odessa*, 990 F.2d 842, 844-45 (5th Cir. 1993). Norman alleges that he filed complaints of retaliation and participated in an investigation of his complaints (Compl. ¶ 19), which could potentially satisfy this element.

Given the early stage of this litigation and the requirement to construe the complaint liberally in Norman's favor, these allegations are sufficient to state a plausible due process claim. While Norman may need to provide additional details as the case progresses, his current allegations are enough to "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

In conclusion, Norman has alleged sufficient facts to state plausible claims for both First Amendment retaliation and deprivation of due process under the Fourteenth Amendment. These claims should be allowed to proceed to discovery, where Norman will have the opportunity to develop additional supporting evidence.

### 3.    Fourteenth Amendment Due Process Claim

While Norman's due process allegations are brief, they are sufficient to survive a motion to dismiss. Norman alleges that his discharge put his "reputation, honor, or integrity at risk"

(Compl. ¶ 47). Construed liberally, this allegation, combined with the allegations of fabricated complaints and pretextual termination, suggests that Norman may be able to satisfy the "stigma-plus" test for a due process claim. See *Bledsoe v. City of Horn Lake, Miss.*, 449 F.3d 650, 653 (5th Cir. 2006). At this early stage, Norman should be permitted to develop this claim through discovery.

### 4.      Qualified Immunity Does Not Bar Norman's Claims

Qualified immunity is not appropriate at this stage because Norman has alleged violations of clearly established constitutional rights. The right to speak on matters of public concern without facing retaliation was clearly established at the time of the alleged conduct. See *Pickering v. Bd. of Ed. of Township High School Dist. 205, Will Cty.*, 391 U.S. 563 (1968).

While the complaint does not detail each individual defendant's specific actions, it alleges that Allen and Malbrough were policymakers who delegated authority to Lt. Haynes, who then engaged in retaliatory conduct. (Compl. ¶ 3). These allegations are sufficient to suggest personal involvement or causal connection to the alleged constitutional violations. See *James v. Tex. Collin Cty.*, 535 F.3d 365, 373 (5th Cir. 2008).

Defendants Allen and Malbrough argue that they are entitled to qualified immunity. However, at this stage of the litigation, dismissal on qualified immunity grounds is premature and inappropriate given the nature of Norman's allegations.

### a)      Legal Standard for Qualified Immunity

Qualified immunity protects government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). To overcome qualified immunity, a plaintiff must allege facts showing "(1) that the official violated a

statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

However, the Fifth Circuit has emphasized that motions to dismiss on qualified immunity grounds are disfavored and should rarely be granted. See *Jacobs v. City of New Orleans*, 994 F.2d 749, 753 (5th Cir. 1993) ("A qualified immunity defense cannot be concluded on the face of the pleadings alone but must be determined in light of specific factual information."). This is because the court must accept the plaintiff's well-pleaded facts as true and draw all reasonable inferences in the plaintiff's favor at the motion to dismiss stage. *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009).

### b)      Clearly Established Rights

Norman has alleged violations of clearly established constitutional rights that would have been known to reasonable officials in the defendants' positions.

### 5.      First Amendment Retaliation

The right of public employees to speak on matters of public concern without facing retaliation was clearly established long before the events in question. See Pickering v. Bd. of Ed. of Township High School Dist. 205, Will Cty., 391 U.S. 563 (1968); Connick v. Myers, 461 U.S. 138 (1983). More specifically, the Fifth Circuit has repeatedly held that speech addressing the integrity and conduct of public officials relates to a matter of public concern. See, e.g., Kinney v. Weaver, 367 F.3d 337, 356 (5th Cir. 2004) (en banc) (finding that speech regarding possible police misconduct addressed a matter of public concern).

Norman's Facebook post, which called for integrity and accountability in leadership (Compl. ¶ 6), falls squarely within this protected category. A reasonable official in the defendants'

positions would have known that retaliating against an employee for such speech violated the First Amendment.

### 6.    Due Process

The right to due process before being deprived of a protected liberty interest in one's reputation plus employment is also clearly established. See Paul v. Davis, 424 U.S. 693, 701 (1976); Rosenstein v. City of Dallas, 876 F.2d 392, 395 (5th Cir. 1989). Norman's allegations suggest that he was terminated based on false, stigmatizing charges without proper process (Compl. ¶¶ 18, 23, 47). A reasonable official would have known that such actions, if true, violate due process rights.

### 7.    Personal Involvement of Defendants

While the complaint does not detail each individual defendant's specific actions, it provides sufficient allegations to suggest personal involvement or causal connection to the alleged constitutional violations.

### 8.    Supervisory Liability

The complaint alleges that Allen and Malbrough were "policymakers for the BISD Police Department, who delegated significant personnel and departmental authority to Lieutenant P. Haynes." (Compl. ¶ 3). In the context of supervisory liability, the Fifth Circuit has held that a supervisor may be held liable if: "(1) he affirmatively participates in acts that cause constitutional deprivation; or (2) he implements unconstitutional policies that causally result in plaintiff's injury." *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011).

Norman's allegations suggest that Allen and Malbrough either participated in or implemented policies that led to the alleged constitutional violations. The delegation of authority

to Lt. Haynes, who allegedly engaged in retaliatory conduct, could be seen as implementing an unconstitutional policy or practice.

### 9.    Causal Connection

Moreover, the Fifth Circuit has recognized that "personal involvement is an essential element of a civil rights cause of action." Thompson v. Steele, 709 F.2d 381, 382 (5th Cir. 1983). However, this involvement can be established through evidence of a causal connection between the defendant's conduct and the constitutional violation. See *Wernecke v. Garcia*, 591 F.3d 386, 401 (5th Cir. 2009).

Norman's complaint suggests such a causal connection by alleging that Allen and Malbrough were the policymakers who delegated authority to Lt. Haynes, who then engaged in the alleged retaliatory conduct (Compl. ¶ 3). This allegation, combined with Norman's claims of systemic retaliation and discrimination (Compl. ¶¶ 17-22), is sufficient at this stage to suggest the defendants' personal involvement or knowledge of the alleged constitutional violations.

### 10.    Fact-Intensive Nature of the Inquiry

The application of qualified immunity in this case involves fact-intensive inquiries that are not appropriate for resolution at the motion to dismiss stage. For instance, determining whether Norman's speech was protected under Pickering requires balancing his interest in speaking against the government's interest in efficient operations. *Pickering v. Bd. of Ed.*, 391 U.S. 563, 568 (1968). This balancing test typically requires a developed factual record. See *Kennedy v. Tangipahoa Parish Library Bd. of Control*, 224 F.3d 359, 366-67 (5th Cir. 2000) (noting that Pickering balancing is often inappropriate at the motion to dismiss stage).

Similarly, assessing the reasonableness of the defendants' actions in light of clearly established law often requires a fact-intensive inquiry. See *Anderson v. Creighton*, 483 U.S. 635,

641 (1987) (explaining that the reasonableness inquiry "will often require examination of the information possessed by the [defendants]"). Such an examination is premature at the pleading stage.

Given the nature of Norman's allegations and the early stage of this litigation, dismissal based on qualified immunity would be inappropriate. Norman has alleged violations of clearly established constitutional rights and has provided sufficient allegations to suggest the personal involvement of Allen and Malbrough. The fact-intensive nature of the qualified immunity analysis in this case further supports allowing the claims to proceed to discovery. As the Fifth Circuit has noted, "One of the most salient benefits of qualified immunity is protection from pretrial discovery, which is costly, time-consuming, and intrusive." *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012). However, this benefit must be balanced against a plaintiff's right to vindicate constitutional violations. In cases like this one, where the plaintiff has alleged plausible constitutional violations, the appropriate course is to allow limited discovery on the issue of qualified immunity rather than dismissing the claims outright. See *Lion Boulos v. Wilson*, 834 F.2d 504, 507-08 (5th Cir. 1987).

Therefore, the Court should deny the defendants' motion to dismiss based on qualified immunity and allow Norman's claims to proceed to the discovery phase.

## C.    State Law Claims

Norman acknowledges that Chapter 21 of the Texas Labor Code does not provide for individual liability. However, dismissal of these claims against Allen and Malbrough in their official capacities would be premature, as those claims are effectively claims against BISD itself.

### 1.    State Law Claims Should Not Be Dismissed in Their Entirety

While Defendants Allen and Malbrough correctly assert that Chapter 21 of the Texas Labor Code does not provide for individual liability, this does not warrant a complete dismissal of the state law claims against them at this stage of the litigation.

#### a)    Official Capacity Claims Under State Law

##### (1)    Equivalence to Entity Claims

Claims against government officials in their official capacities are effectively claims against the governmental entity itself. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). This principle applies to both federal and state law claims. Therefore, the state law claims against Allen and Malbrough in their official capacities should be treated as claims against BISD.

### 2.    Preservation for Effective Relief

Maintaining official capacity claims under state law can be crucial for ensuring comprehensive relief. As the Texas Supreme Court has noted, "suits against a governmental unit and its employees in their official capacities are essentially the same." *City of El Paso v. Heinrich*, 284 S.W.3d 366, 373 (Tex. 2009). By retaining these claims, Norman preserves his ability to seek all available remedies under state law, including potential injunctive relief.

### 3.    Consistency with Federal Claims

Given that the official capacity claims under federal law are being maintained (as argued in Section II.A of this response), it would be inconsistent and potentially confusing to dismiss the state law official capacity claims at this stage. Maintaining parallel state and federal claims can facilitate a more comprehensive analysis of Norman's rights and potential remedies as the case progresses.

### 4.    Individual Capacity Claims Under State Law

#### a)    Acknowledgment of Statutory Limitation

Norman acknowledges that Chapter 21 of the Texas Labor Code does not provide for individual liability. See *Anderson v. Houston Comm. Coll. Sys.*, 458 S.W.3d 633, 648 (Tex. App.—Houston [1st Dist.] 2015, no pet.) ("It is well established in Texas that an individual cannot be held personally liable under [Chapter 21 of the Texas Labor Code].").

#### b)    Potential Alternative State Law Claims

However, this limitation does not preclude the possibility of other state law claims against Allen and Malbrough in their individual capacities. While not explicitly pleaded in the current complaint, Norman's factual allegations might support claims such as tortious interference with employment relations or intentional infliction of emotional distress. See, e.g., *Wal-Mart Stores, Inc. v. Lane*, 31 S.W.3d 282, 293 (Tex. App.—Corpus Christi 2000, pet. denied) (recognizing a claim for tortious interference with employment relations); *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 611 (Tex. 1999) (discussing the elements of intentional infliction of emotional distress).

#### c)    Request for Leave to Amend

Given the potential for alternative state law claims, Norman respectfully requests that if the Court is inclined to dismiss the individual capacity claims under Chapter 21, it grant leave to amend the complaint to clarify and potentially add alternative state law claims against Allen and Malbrough in their individual capacities. The Fifth Circuit has held that "district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable, or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002).

### 5.    Interplay Between State and Federal Claims

#### a)    Supplemental Jurisdiction

The Court has supplemental jurisdiction over Norman's state law claims pursuant to 28 U.S.C. § 1367, as they form part of the same case or controversy as the federal claims. The Supreme Court has encouraged courts to retain supplemental jurisdiction in cases where dismissing state claims would result in parallel federal and state proceedings. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

#### b)    Factual Overlap

The state law claims against Allen and Malbrough arise from the same core of operative facts as the federal claims. Maintaining these claims, at least through the discovery phase, will promote judicial economy and prevent potentially inconsistent results. See *Mendoza v. Murphy*, 532 F.3d 342, 346 (5th Cir. 2008) (noting that the existence of a substantial federal claim supports the exercise of supplemental jurisdiction over related state law claims).

#### c)    Comprehensive Resolution

Allowing the state law claims to proceed alongside the federal claims will facilitate a more comprehensive resolution of the dispute. The Texas Supreme Court has recognized the value of resolving related state and federal claims in a single proceeding. See *In re AutoNation, Inc*., 228 S.W.3d 663, 670 (Tex. 2007) (discussing the benefits of resolving related claims in one forum).

While Chapter 21 of the Texas Labor Code does not provide for individual liability, this limitation does not justify dismissing all state law claims against Allen and Malbrough at this stage. The official capacity claims under state law should be maintained as they are effectively claims against BISD. For individual capacity claims, Norman requests leave to amend to potentially assert alternative state law claims. Given the interplay between the state and federal claims and the

interests of judicial economy, the Court should exercise its supplemental jurisdiction and allow the

state law claims to proceed alongside the federal claims, at least through the discovery phase.

### III.    CONCLUSION

Based on the declaration, here are the key facts that support a claim of First Amendment

retaliation:

1. Norman made a Facebook post on October 20, 2022, which he describes as "a prayer on a matter of public concern having to do with an upcoming intention to run for office" (paragraph 7).

2. The post called for integrity and accountability in leadership, which Norman argues was related to his campaign message when he ran for Sheriff (paragraphs 13 and 35).

3. Norman asserts that the post did not single out any agency or supervisors of his present or previous employers (paragraph 7).

4. Shortly after the post, on October 21, 2022, Norman received a formal complaint notification for Employee Misconduct (paragraph 7).

5. Norman was suspended for 10 days without pay specifically for this Facebook post (paragraph 11).

6. The suspension was extended during the Christmas Holidays, effectively making it longer than 15 days (paragraph 11).

7. Norman was also prohibited from participating in any district activities, including athletic events, and was not allowed to return to any BISD facilities or campuses without consent from the Chief of Police (paragraph 11).

8. Norman argues that these restrictions were not part of the department's policy and believes they were "made up" as "another attempt at harassment and bullying" (paragraph 12).

9. Norman was eventually separated from the BISD Police Department on April 21, 2023, which he believes was related to this incident (paragraph 28).

10. Norman claims he did not receive due process in the grievance process and that the district conducted a "result-oriented investigation" that did not consider his side (paragraph 29).

11. Norman argues that his speech was a matter of public concern related to supervisors in law enforcement everywhere and was connected to his campaign message when he ran for Sheriff (paragraph 35).

These facts support a claim of First Amendment retaliation by showing that Norman

engaged in protected speech (the Facebook post about leadership integrity) and subsequently faced

adverse employment actions (suspension, restrictions, and eventual termination) that are causally connected to that speech.

For the foregoing reasons, Defendants Allen and Malbrough's motion to dismiss should be denied. At minimum, Norman should be granted leave to amend to address any perceived deficiencies in the complaint.

RESPECTFULLY SUBMITTED this 24th day of September 2024.

Respectfully Submitted,

THE MONK LAW FIRM
4875 Parker Drive
Beaumont, Texas 77705
Phone:  (409) 724-6665
Fax:  (409) 729-6665
brandon@themonklawfirm.com

By: _____
/s/ Brandon P. Monk

BRANDON P. MONK
State Bar No. 24048668
ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on September 24, 2024, a true and correct copy of the foregoing was served via ECF on all parties of record.

/s/ Brandon P. Monk
_____
BRANDON P. MONK